Hugh R. GOODRICH, et al.

v.

EXXON CORPORATION, et al.

Civ. A. No. 85–1290.

United States District Court,
W.D. Louisiana,
Lafayette—Opelousas Division.

May 29, 1986.

Jack C. Caldwell, Franklin, La., for plaintiffs.

William J. Sommers, Jr., Randall M. Ebner, Exxon Co., U.S.A., C. Murphy Moss, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendants.

## MEMORANDUM OPINION

PUTNAM, Senior District Judge.

This is a suit to cancel an oil and gas lease dated May 17, 1943, extended May 17, 1948, covering 1245.44 acres of land in St. Martin and St. Mary Parishes in the State of Louisiana. Plaintiffs own a 5/16 interest in the leased premises; the remaining owners have been brought into the action by plaintiffs as nonresident defendants. The parties have filed a comprehensive pretrial stipulation setting forth in detail the historical facts surrounding the lease, which culminated in the creation of a voluntary unit known as the "Duck Lake Fieldwide Unit" ("Fieldwide Unit" or "Unit"), established by the Commissioner of Conservation of Louisiana by Order No. 174–A thru E, and No. 174–F–1 on or about March 21, 1958, effective February 1, 1958. (Defendants' Exhibit 6).

Since the Goodrich lease was confected, approximately 101 wells have been drilled in the Fieldwide Unit, involving approximately 277 successful completions in 26 producing horizons. Defendant Exxon has drilled 64 wells in the Unit, of which 23 are on lands described in the lease. The total cost of drilling, completing and equipping oil and gas wells on the Goodrich lease or acreages unitized therewith has been $32,821,132.00, of which at least $6,744,823 is Exxon's joint interest share, and, in addition, the operators have spent some $2,119,096.00 for facilities on or recompleting wells on Goodrich land within the Duck Lake Fieldwide Unit in the period from December 14, 1981 to April, 1984, with Exxon's share being from 53.76% to 62.6%.

Over the years, the Duck Lake Fieldwide Unit has produced approximately 76,000,000 barrels of oil and one and one-half trillion cubic feet of natural gas. From 1973–1985, $4,219,742.00 has been paid to plaintiffs (hereinafter sometimes referred to as "Goodrich") with $182,000.00 being paid in the year 1985. From 1968 to 1985, Goodrich has been paid approximately $7,000,000.00 from the Unit.[1]

Plaintiffs' predecessor in title and a party to the original "Operating Parties Agreement" was R.H. Goodrich of Houston, now deceased. In addition to the lease which is the subject of this suit, Mr. Goodrich was also lessee of other properties in the Duck Lake Field which were brought into the Fieldwide Unit.[2] As a party to the Operating Agreement,[3] Goodrich had the right at his own risk to drill within the Unitized Area and to complete the well so drilled in any sand whatsoever, but if completed in a unitized sand, he did not have the right to produce oil or gas therefrom, this being the responsibility of the Operator Humble, now Exxon.

It would seem that in the light of these clear contractual provisions, nothing prevented Goodrich from drilling to a deeper formation than those specified in the Operating Agreement and producing therefrom if successfully completed. We note that Mr. Goodrich is himself an independent oil operator; he testified on cross examination that his operation includes drilling for oil and gas and also exploration work in search thereof. He has been engaged in partnership activities with Birthright Oil & Gas, and it would seem that he could, himself, conduct any deep test in the Fieldwide Unit he chooses.

Mr. Goodrich has long been dissatisfied with the Exxon operations in the Duck Lake area. After a series of demand letters in 1966 he filed a similar suit to the one at bar in the Sixteenth Judicial District Court of Louisiana, in the parish of St. Martin. This suit also demanded cancellation of the lease below the deepest producing horizon in the Fieldwide Unit, and remained pending in the State Court until finally dismissed for lack of prosecution in

---

1. In addition to the Exxon efforts in the Fieldwide Unit, it has participated in a number of "farm-in" and "farm-out" agreements with numerous companies in acreage surrounding the Unit.

2. Pretrial Stipulation, Par. 5(11).

3. Joint Exhibits 3 & 4, (Article X p. 11)

March, 1980.[4] We conclude that with respect to the land included in the Fieldwide Unit, Exxon is not in default and has fulfilled its obligation to reasonably develop the lease premises.[5]

As a result of the decision in *Hunter Co. v. Shell Oil Co.*, 211 La. 893, 31 So.2d 10 (1947), the so-called "Pugh Clause" was introduced into all lease forms in use in this state. This clause provides that drilling of a well on lands included in a unitized area will *not* maintain the lease on lands leased therewith but not included in the Unit. The lease at issue here does not contain such a clause. The Goodrich lease would, under the rule announced in *Hunter Co.*, supra, be continued beyond its primary term by production within the unit.

■ However, lack of the "Pugh Clause" in the lease does not entitle the lessee to hold land lying outside of a unitized area indefinitely. There is an implied obligation long recognized in this state that the lessee must perform his contract in good faith and develop and operate the property leased "... as a reasonably prudent operator for the mutual benefit of himself and his lessor ..." See LSA–R.S. 31:122 and comment thereto. The authorities cited by plaintiff control the situation here. *Sauder v. Mid-Continent Petroleum Corp.*, 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255 (1934); *Carter v. Arkansas Louisiana Gas Co.*, 213 La. 1028, 36 So.2d 26 (1948); *Sohio Petroleum Company v. Miller*, 237 La. 1015, 112 So.2d 695 (1959) decided the same day as *Middleton*, supra, n. 5; and *Vetter v. Morrow*, 361 So.2d 898 (La.App.1978) are but a few of the cases recognizing and applying the principle with results opposite to the *Middleton* case, supra, n. 5. In these cases, the Court ordered cancellation of the leases in question as to land included in the lease but lying outside of a unitized or developed area.

■ The Court does not wish to compromise any confidential matter in evidence by explicitly developing the facts in this opinion. At least four prospective locations on lands outside of the Unit have been proposed by defendants' geologists and referred to management, where they quietly expired. Had the Beltrame prospect in Section 5, Tp. 15S–R12E, for example, been developed this suit would probably never have been filed. It is true that Exxon attempted to farm out this prospect, inviting 50 operators to look at it and take it over, and that only one, Ashland Oil Company, showed sufficient interest to follow up on the offer. After a presentation made by Exxon's geologists, this company declined the farm-out. Defendant argues that this experience as well as other factors establish that a prudent operator would not further develop the Goodrich lands outside of the Fieldwide Unit.

The short answer is to be found in the testimony of Mr. Beltrame, Mr. Gross and Mr. Carroll. These geologists testified that although they were (in varying degrees) enthusiastic about the Beltrame prospect, their recommendations died in the management division of Exxon. Mr. Carroll testified further that Exxon has no intention of drilling either in Section 5, Tp. 15S–R12E (east of the Fieldwide Unit), or in Section 4, Tp. 15S–R11E (west of the Unit). Mr. Gross stated that Exxon has constantly evaluated their geological data over the years and the company has not found a drillable prospect on or near the Goodrich lands outside of the Unit. In other words, by Exxon's own witnesses the fact is established that no further development of the Goodrich lands outside of the Unit is planned. The cases cited above require that the lease be cancelled as to this acreage and the owners be permitted to seek

---

4. Joint Exhibit 43.

5. LSA–R.S. 31:122; *Middleton v. California Co.*, 237 La. 1039; 112 So.2d 704 (1959); *Allen v. Horne*, 478 So.2d 671 (La.App. 2 Cir.1985). In addition to the large expenditure of funds developing the Unit, Exxon has constructed gathering lines, tank batteries and many other works

upon the lease premises. Photographs of these installations are in the record. See testimony of Mr. Donald Dressler and exhibits D–18 and D–19. Mr. Dressler testified that the replacement value of these facilities approximates $28,000,-000.00.

development from other operators active in the area.

There being an express decision of defendant Exxon not to develop the Goodrich lands lying outside of the Fieldwide Unit, they are in default of the implied obligation to reasonably develop these prospects. This being the case, to require a prior judicial determination as provided for in paragraph 9 of the lease would be a vain and useless thing. *Melancon v. The Texas Company,* 230 La. 593, 89 So.2d 135 (1956); cf. *Cutrer v. Humble Oil & Refining Co.,* 202 F.Supp. 568 (E.D.La.1962), *aff.* 309 F.2d 752 (5 Cir.1962), *cert. den.* 372 U.S. 937, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); *Frick-Reid Supply Corp. v. Meers,* 52 S.W.2d 115 (Tx.Civ.App.1932); *Gillette v. Pepper Tank Co.,* 694 P.2d 369 (Colo.App. 1984). Frick-Reid Supply Corp., supra, holds that such a clause violates public policy in the State of Texas. It is not necessary for us to make such a holding here, and we expressly do not do so.

Also before the Court at this time is the motion of the attorney appointed herein to represent absent defendants necessarily brought into this suit, to have the Court fix the amount of his fees. We grant the motion and fix the fees payable to this attorney in the sum of Five Hundred ($500.00) Dollars, to be taxed as costs.

■ Goodrich also seek damages and attorney's fees for prosecution of this suit. LSA–R.S. 31:206 et seq. deal with this question. In the case of a mineral lease as distinguished from a mineral right upon property, it is now established that a successful plaintiff in a suit for dissolution of a mineral lease for failure to comply with its obligation is entitled to damages and attorney's fees. In *Sohio Petroleum Co. v. Miller,* supra, attorney's fees were allowed in such a situation even before adoption of the Louisiana Mineral Code. Since then, the case of *Webb v. Hardage Corp.,* 471 So.2d 889 (La.App. 2 Cir.1985) has construed the provisions of the Mineral Code and concluded that a good-faith dispute such as we undoubtedly have here does not preclude award for damages and attorney's fees. The decision is pitched upon the language of LSA–R.S. 31:208 excluding mineral leases from the good-faith dispute defense. We are bound by the statutory provisions and the decision of the Louisiana Court of Appeals interpreting them.

■ In this case, the attorney for Goodrich has filed an affidavit stating that he has expended approximately 266 hours of professional work time in pretrial proceedings and preparation for trial through March 24, 1986. This approximation is not supported by records or expert testimony showing the value of such services. We believe that a total fee of $10,000 for all services rendered including the trial of the case will, under the circumstances, reasonably compensate plaintiff's attorney on the basis of the record before us.

■ The claim of plaintiffs for damages is denied. It is not supported in the record. There is no showing of drainage or other physical damage to the property in question. Damages alleged to be due by reason of lost opportunity to lease the Goodrich interest are highly speculative in nature and this Court will not penalize defendant Exxon for asserting its defenses to the action as it had every right to do.

Judgment is rendered accordingly. Entry will be made upon filing of a formal decree.

### DECREE

For written reasons assigned IT IS NOW ORDERED AND DECREED that:

I. Plaintiffs' demands for cancellation and dissolution of the oil, gas and mineral lease dated May 17, 1943, as extended by act dated May 17, 1948, recorded under entry numbers 64921 and 78769 of the records of St. Martin Parish, Louisiana, as to all minerals included within the limits of the Duck Lake Fieldwide Unit lying below the deepest producing horizon in said Unit, be, and the same are hereby denied.

II. Plaintiffs' demands for cancellation and dissolution of said lease as to all remaining lands covered and affected by the

same and lying beyond the limits and confines of the Duck Lake Fieldwide Unit be, and the same are hereby granted, and said lease is hereby ordered dissolved and cancelled, such land being more specifically described as follows:

(1) All that portion of Section 4, Township 15 South, Range 11 East of the Louisiana Meridian, lying outside of the boundary, limits and confines of the Duck Lake Fieldwide Unit; less and except the NE/4 of NE/4 of said Section 4.

(2) The west half of the northeast quarter and the northeast quarter of the northeast quarter; the northwest quarter of the southeast quarter and the southeast quarter of the southeast quarter of section 5, Township 15 South Range 12 East. (W/2 and NE/4 of NE/4, NW/4 of SE/4 and SE/4 of SE/4 of Sec. 5 Tp. 15S–R12E)

(3) The southwest quarter of the southwest quarter of Section 32 Township 14 South Range 12 East (SW/4 of SW/4 Sec. 32, Tp. 14S–R12E).

(4) The east half of northeast quarter, the northwest quarter of the northeast quarter (E/2 of NE/4 and NW/4 of NE/4) of Sec. 31 and the northeast quarter of the northwest quarter, and all that part of the northwest quarter of the northwest quarter of said Section 31 Tp. 14 south, Range 12 East and a portion of the northeast quarter of northeast quarter of Section 36 (NE/4 of NW/4 and that part of the W/2 of NW/4 of NW/4 Sec. 31 and a portion of the NE/4 of NE/4 of Sec. 36, Tp. 14S–R12E) all lying outside of the boundary, limits and confines of the Duck Lake Fieldwide Unit in St. Martin Parish, Louisiana.

(5) All that portion of the SE/4 of SW/4 Sec. 31 Tp. 14S–R12E Louisiana Meridian lying outside of the Duck Lake Fieldwide Unit.

Otherwise the lease as extended and as to all lands owned by plaintiffs lying within the Duck Lake Fieldwide Unit, shall be and remain in full force and effect.

III. That attorney's fees for Raymond L. Marie, Esq. of New Iberia, Louisiana, appointed herein to represent absent parties be and they are hereby fixed in the sum of Five Hundred ($500.00) Dollars.

IV. That plaintiffs' demand for damages be denied.

V. That plaintiffs' demand for attorney's fees be granted and such fees are fixed in the sum of Ten Thousand and No/100 ($10,000.00) Dollars.

VI. That the costs of this suit be borne equally by the parties hereto.